# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.



**DEFENDANT'S EXHIBIT**
ALL-STATE LEGAL®
**1**

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NO. CV-1:05-CV-717-A


SHIRLEY Z. LEE,

        Plaintiff,

vs.

COMPASS BANCSHARES, INC.,

        Defendant.




DEPOSITION

OF

SHIRLEY Z. LEE

January 13, 2006



REPORTED BY:  Heather Spier

        Court Reporter and

        Notary Public

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  that you completed on Defendant's Exhibit

2  3, is it true and correct at least at the

3  time in which you completed it?

4       A.    Yes, yes, it is.

5       Q.    Now, is that your signature on

6  the last page of Defendant's Exhibit 3 at

7  the bottom?

8       A.    Yes.

9       Q.    I have your hire date as being

10 April 30, 2001.  Does that sound correct?

11      A.    30th.  Yes, I think that's

12 right.  I thought it was early April, but

13 it's late April.

14      Q.    Well, I don't know that it

15 matters which day.  But you recall it

16 being April 2001; is that correct?

17      A.    Yes, that's right.

18      Q.    Who hired you?

19      A.    Regina McNeil and Jerri

20 Carothers.  I don't know which one.

21      Q.    Okay.  You don't know who made

22 the final decision?

23      A.    I think Regina McNeil.

# ⅃Ⅼ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       Q.      And why do you say that?

2       A.      Because she is branch manager,

3  and Jerri is only customer service

4  manager.

5       Q.      Who interviewed you for the

6  position?

7       A.      Regina and Jerri.

8       Q.      And you were hired into a

9  teller position; is that correct?

10      A.      Yes, that's right.

11      Q.      And who was your supervisor

12 when you first were hired in the teller

13 position?  Was it Jerri?

14      A.      Jerri Carothers.

15      Q.      And Carothers is I think

16 C-A-R-O-T-H-E-R-S?

17      A.      Yes, that's right.

18      Q.      Do you know who else applied

19 for your job besides you?

20      A.      No, I did not know that.

21      Q.      So you don't know who you were

22 selected over?

23      A.      I don't think anybody else,

# Ⅱⴺ TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  assistant from SouthTrust Bank, and also I

2  have a lot of customer service skills also

3  from Colonial Mortgage Company.

4      Q.   I don't mean to interrupt you,

5  but I think you misunderstood my question,

6  perhaps because I didn't ask you

7  correctly --

8      A.   Education?

9      Q.   No. Actually, I'm asking you

10 what training did you receive from Compass

11 to perform the teller duties? You know,

12 after you were hired as a teller and

13 before you actually start working the

14 duties, were you trained on how to be a

15 teller?

16     A.   I have about three days of

17 training, actually, just basically, you

18 know, how to get on their system. Their

19 computer, you know, system a little bit

20 different from what I have before.

21     Q.   And who performed that

22 training?

23     A.   Jean.  Jean.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      Q.    Well, that's okay if you don't

2    know her name.

3      A.    Jean.  Regina can help me.

4      Q.    J-E-A-N?

5      A.    Yeah.  I just can't remember

6    right now.

7            MS. MCNEIL:  Jean Clark.

8      Q.    Does Jean Clark sound

9    familiar?

10     A.    Yes, Jean Clark.

11     Q.    Where was the training

12   performed?

13     A.    At the bank.

14     Q.    At your branch?

15     A.    Yes, at a branch.

16     Q.    And was the training

17   one-on-one with you, or were there other

18   tellers going through the training at the

19   same time?

20     A.    One-on-one.  One-on-one to me.

21     Q.    And can you tell me in general

22   what things were covered during that

23   training?

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1      A.      I think it was all the
2   machines, which was different from what I
3   had before.  So basically she just showed
4   me, you know, how to use their machines,
5   you know, because I already know how, you
6   know, how to do the teller job.
7      Q.      Anything else you recall being
8   gone over in training?
9      A.      I don't remember.
10     Q.      You don't remember.  Okay.
11             (Whereupon, Defendant's
12             Exhibit 4 was marked
13             for identification.)
14     Q.      Ms. Lee, let me show you what
15   I'm marking as Defendant's Exhibit 4,
16   which is entitled Teller Performance
17   Expectations.  Is that your signature at
18   the bottom of Defendant's Exhibit 4?
19     A.      Yes.
20     Q.      And do you recall receiving
21   this document?
22     A.      Yes.
23     Q.      And were there any discussions

1    or training about this document, or was it

2    a document that you were just handed and

3    signed?  Or can you tell me what the

4    discussions were around the document I

5    guess is my question?

6         A.    I don't remember we have any

7    discussion about this.  She, you know --

8    basically Jerri just told me, you know,

9    teller performance that I was expected to

10    do.  So she told me to sign the bottom.  I

11    did.

12        Q.    And did you read this

13    document?

14        A.    I did, you know, quickly I

15    think.

16        Q.    Did you get a copy of this

17    document?  Is it put somewhere for you to

18    keep or --

19        A.    I was not give a copy of this.

20        Q.    You don't have a copy of it or

21    you weren't given one at the time?

22        A.    I don't remember I have a copy

23    of this.

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1        Q.       Okay.  Let me just make sure I

2    understand your answer.  You don't

3    remember one way or the other?

4        A.       Right.

5        Q.       I have been told that there's

6    a notebook put together for tellers to

7    keep documents such as this one and about

8    delegated authority; is that correct?

9        A.       Yes, that's correct.

10       Q.       And Jerri Carothers creates

11   those notebooks?

12       A.       Yes.

13       Q.       And where are those notebooks

14   kept?

15       A.       That's the handbook.  Normally

16   you just insert, you know, new things or

17   new policy in the handbook.

18       Q.       Separate from the handbook is

19   there a notebook, though, specific for

20   tellers and teller procedures?

21       A.       I don't remember.

22       Q.       Okay.  Anything else you

23   recall being said at the time you received

## TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1     Q.     You don't remember one way or
2   the other?
3     A.     That's when I -- no, I don't
4   remember.
5     Q.     You don't remember one way or
6   the other, Ms. Lee, is that what you're
7   saying?
8     A.     Yes, that's what I'm --
9                   (Whereupon, Defendant's
10                  Exhibit 6 was marked
11                  for identification.)
12    Q.     Ms. Lee, let me show you what
13  I'm marking as Defendant's Exhibit 6.  On
14  the top right it's entitled Delegated
15  Authorities - Teller.  And my first
16  question is is that your signature at the
17  bottom left corner of the document?
18    A.     Yes.
19    Q.     And it's dated on 11/28/01.
20  Is that when you signed it?
21    A.     Yes, that's right.
22    Q.     And my understanding, this is
23  the delegated authorities, meaning this is

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    the authority or the amount that you can

2    do certain transactions without getting

3    approval from management; is that correct?

4           A.      Yes, that's right.

5           Q.      Do you recall any discussions

6    about your delegated authority when you

7    received this document?

8           A.      No, but I remember I did

9    receive a copy of this.

10          Q.      And where was it kept?

11          A.      In a handbook, in my handbook.

12          Q.      Okay.  Did you put documents

13   like this in your regular employee

14   handbook?  Is that what you were telling

15   me earlier?

16          A.      Yes.

17          Q.      Okay.  I was the one that was

18   confused, then.

19          A.      Okay.

20          Q.      So you would just take it and

21   put it in your regular employee handbook

22   that all employees at Compass Bank get; is

23   that correct?

# ⏄ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1    best teller because I was fast, efficient,
 2    accurate to handle the job, you know, very
 3    fast and efficiently.
 4         Q.    My question was the name.  Do
 5    you remember the names of the customers?
 6         A.    I do.  Actually, I do
 7    remember.  I mean, I know her exactly, but
 8    I can't remember her name.  I can tell you
 9    later I'm sure.
10         Q.    Okay.  If it comes to you, you
11    just let me know.
12         A.    Yes, I will tell you later
13    because I just can't remember right now at
14    this moment.
15         Q.    Is it one or more than one?
16         A.    More than one.
17         Q.    Okay.  Now, at some point
18    you -- I don't know if it was a promotion,
19    but you were moved to the senior teller
20    job; is that correct?
21         A.    Right, yes.  After the first
22    year, yes.
23         Q.    And who would have promoted
```

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1   you or moved you into that position?

2        A.    Jerri Carothers.

3        Q.    It's my understanding that you

4   applied for the financial sales rep

5   position; is that correct?

6        A.    Yes, I did.

7        Q.    And going back to the answers

8   to the interrogatories, Exhibit 1, if you

9   look at number eighteen --

10       A.    Yes.

11       Q.    -- I believe the question was

12  to list the financial sales reps or the

13  FSR positions that you believe you have

14  been discriminatorily denied.  And D has

15  got Jennifer, Leslie Webb and Holly

16  Brownell.  Are those the positions, the

17  FSR positions, that you believe you were

18  discriminatorily denied?

19       A.    Yes.

20       Q.    The ones that they filled?

21       A.    Yes, that's right.  I remember

22  Jennifer's name.  Her last name is Little,

23  Jennifer Little.
```

# TE TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1      Q.      Okay.  And I believe Leslie's

2   last name is Webber.  Does that sound

3   right instead of Webb?

4      A.      Yes, that's right.  I'm sorry.

5      Q.      That's okay.

6      A.      I don't remember exactly.

7      Q.      I knew who you were talking

8   about.

9              (Whereupon, Defendant's

10             Exhibit 8 was marked

11             for identification.)

12     Q.      Let me show you Defendant's

13  Exhibit 8.  And this document is entitled

14  at the top Bid Application.  Does this

15  document look familiar to you?

16     A.      Yes.

17     Q.      Now, it's my understanding

18  that you would complete the top portion of

19  the bid application, because you see it

20  says to be completed by employee?

21     A.      Yes.

22     Q.      So let me back up.  Is that

23  your signature there where it says Shirley

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   Lee, employee signature, in the middle of

2   the page?

3         A.    I can't see my signature.

4   Where?  Oh, yes.  Yes, that's right.

5         Q.    It's a little bit smaller than

6   some of the other signatures.

7         A.    Yes.

8         Q.    And you would have completed

9   this bid application on September 12,

10  2002?

11        A.    Yes.

12        Q.    And according to the bid, it's

13  for an FSR position; correct?

14        A.    Yes.

15        Q.    And my understanding was

16  Jennifer Little was the person, the FSR,

17  who got this particular position; is that

18  correct?

19        A.    Yes, that's correct.

20        Q.    And then what did you do with

21  this bid application?  Do you give it to

22  human resources or to Jerri?

23        A.    I give it to branch manager.

# ⅢⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    Okay.  To Regina McNeil?

2    A.    Yes.

3    Q.    And I'm assuming that the next

4  part of it that says completed by

5  employee's supervisor, you don't see that

6  part?

7    A.    I see her signature here.

8    Q.    Yeah, you see it now.  What

9  I'm saying is you turn it in, and then

10  they complete the bottom part of the bid;

11  is that correct?

12    A.    Yes.

13    Q.    Okay.  Now, had you ever held

14  the financial sales representative

15  position before?

16    A.    Not exactly position, but I

17  just have some experience.

18    Q.    Okay.  What experience did you

19  have that's related to the FSR position?

20    A.    You know, I have a lot of

21  customer service skills already through

22  work at Colonial Mortgage Company and

23  SouthTrust Bank, even K.O.K Trading

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        Q.      Anybody else?

 2        A.      No.

 3        Q.      And what were you told about

 4   your selection?  Did someone tell you you

 5   didn't receive the job, or did you just

 6   see Jennifer Little in the job?  How were

 7   you notified that you didn't get the job?

 8        A.      I believe I was notified, you

 9   know, after interview, you know, someone

10   has more experience was going to transfer

11   to our branch to take this position.

12        Q.      And do you recall when you

13   were notified that you didn't receive the

14   job?

15        A.      I remember to say the end of

16   the interview I was told, you know.

17        Q.      You believe it was at the end

18   of 2002?

19        A.      No, the end of the -- at the

20   end of the interview.

21        Q.      Oh, I'm sorry.  How much time

22   elapsed just in general between your bid

23   application and your interview?  Are we
```

# ☰ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.     I have -- you know, I think I
2   have maybe the same, you know, amount of
3   training as she has.  I have a higher
4   education background.  You know, I work --
5   I have a better working attitude than she
6   has.  I'm better customer skilled than she
7   has.  But I think it's just because I'm
8   Asian-American that's why I didn't get it
9   and she's white.
10      Q.     So you believe that you were
11   discriminated against when you didn't
12   receive the position?
13      A.     Yes.
14      Q.     Did you believe that at the
15   time when you were told you didn't get the
16   position, that you had been discriminated
17   against?
18      A.     Actually, I was disappointed
19   that I didn't get the job.  You know, I
20   was disappointed I didn't get any, you
21   know, chance.
22      Q.     My question is a little bit
23   different.  I'll back up a little bit.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    You said you believe you didn't get the

2    FSR position because you're

3    Asian-American?

4         A.     Right.

5         Q.     And my question was at the

6    time you were told you're not going to get

7    this job, did you believe at that time --

8         A.     Right.  Actually --

9         Q.     Wait.  Let me finish my

10   question.  Did you believe at that time

11   that you had been discriminated against

12   because you're Asian-American?

13        A.     Actually, I see that now.  At

14   that time, you know, I did not recognize

15   that yet in September 13, '02 I didn't.  I

16   didn't know that.

17        Q.     When did you first believe

18   that you were discriminated against with

19   respect to the FSR position that was

20   filled by Jennifer Little?

21        A.     I have little bit of feeling

22   after Leslie got the job, and that was

23   very confirmed about that after Holly

# ⌈⌊ TYLER EATON

### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  Brownell got the job.

2      Q.    I am so sorry.  I just didn't

3  understand at all what you said.  I

4  apologize.

5      A.    Okay.

6          MR. KAUFFMAN:  Did you get it?

7  Could you -- let's let the court reporter

8  read it.

9          (Record read.)

10      Q.    So let me just follow up on

11  that.  You had a suspicion that you were

12  discriminated against after Leslie got the

13  job, and your suspicion was confirmed and

14  felt you had been discriminated against

15  after Holly Brownell received her FSR

16  position?

17      A.    Yes.  Yes, you're right.

18      Q.    What do you know about

19  Jennifer Little's qualifications prior to

20  her receiving the FSR position?

21      A.    I thought she was a teller

22  too, work at Compass Bank.  She work at

23  the Eufaula branch.  She was a teller too.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        Q.     And my question is do you
 2   recall sitting here today what she
 3   highlighted or what she --
 4        A.     No.
 5        Q.     Okay.
 6        A.     No. I'm sorry.
 7               (Whereupon, Defendant's
 8               Exhibit 10 was marked
 9               for identification.)
10        Q.     Ms. Lee, let me show you what
11   I have marked as Defendant's Exhibit 10,
12   which is a memo to you from Jerri
13   Carothers dated November 5, 2002,
14   Attendance, Written Warning.  Is that your
15   signature at the bottom of the document?
16        A.     Yes.
17        Q.     And you would have signed this
18   on November 6, 2002?
19        A.     Yes.
20        Q.     And do you recall any
21   discussions surrounding this written
22   warning for attendance?
23        A.     No, I don't remember we had
```

**TE TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   any discussion, but I were, you know, just

2   told, because, you know, the number of

3   times of absence, you know, so I have to

4   sign this form.

5        Q.    And do you recall the reasons

6   for the absences listed here?

7        A.    I know most of time -- yes,

8   because my son was sick or sometime, you

9   know, the school has, you know, little bit

10  of accident they call me up.  I have to

11  leave, you know, for like one hour.  It's

12  still counted absence.  And then next

13  day -- one day the kid, he fell from the

14  swing, so they called me.  So I left like

15  one hour early, so it was counted too.

16  And another time, you know, my kid had,

17  you know, bad cold, so he couldn't go

18  to the -- he was not allowed to take to

19  daycare, so I have to call for, you know,

20  for sick leave.  But it all counts.  You

21  know, everything count.  You come in late,

22  you know, it count too.

23        Q.    On the second line of

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   Talking about Regina McNeil?

2        A.      Yes, and Jerri Carothers.

3                (Whereupon, Defendant's

4                Exhibit 11 was marked

5                for identification.)

6        Q.      Ms. Lee, let me show you what

7    I'm marking as Defendant's Exhibit 11, and

8    I'm going to give you a second to read it

9    because I'm not sure if you've ever seen

10   it before.  Have you ever seen Defendant's

11   Exhibit 11 before?

12       A.      No.

13       Q.      Do you recall the incident

14   that's stated in Defendant's Exhibit 11, a

15   complaint by a Willie Lee Pittman?

16       A.      No.

17       Q.      Is there anything that sounds

18   familiar about Defendant's Exhibit 11 at

19   all?

20       A.      No.  But I do know Ms.

21   Pittman.

22       Q.      Okay.  How do you know Ms.

23   Pittman, just being a customer?

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1        A.      Right.   I seen -- I saw her

2    several times at the bank.

3        Q.      And do you recall any

4    discussions that either Ms. McNeil had

5    with you or Ms. Carothers about a

6    complaint by Willie Lee Pittman?

7        A.      No, we never have discussion

8    about this.   But I do have a comment, you

9    know --

10              MR. NEWMAN:   Well, let me ask

11    the questions.

12        A.      Okay.

13              (Whereupon, Defendant's

14              Exhibit 12 was marked

15              for identification.)

16        Q.      Ms. Lee, let me show you what

17    I'm marking as Defendant's Exhibit 12.

18    This document is entitled Bid Application.

19    Do you see your -- is that your signature

20    on Defendant's Exhibit 12 about halfway

21    down?

22        A.      Yes.

23        Q.      It's my understanding this is

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    your bid application for the job filled by

2    Holly Brownell; is that correct?.

3         A.    Yes, I think so.

4         Q.    And this is once again for the

5    FSR position?

6         A.    Yes.

7         Q.    Were you interviewed for the

8    FSR position filled by Holly Brownell?

9         A.    Yes.

10        Q.    And who interviewed you?

11        A.    Regina McNeil.

12        Q.    Anybody else?

13        A.    No.

14        Q.    Do you recall anything that

15   was said during the interview?

16        A.    No.

17        Q.    When did you learn that you

18   didn't receive the FSR position that was

19   given to Holly Brownell?

20        A.    I was told, you know, about

21   the same thing. Someone else, you know,

22   has more experience was going to, you

23   know, transfer here to get the position.

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1        Q.      And do you recall when you

2    were told that?  Was it during the

3    interview or was it after the interview?

4        A.      No.  At the end of the

5    interview.

6        Q.      And do you recall, just

7    approximately, how much time elapsed

8    between your bid application and when you

9    were interviewed?

10       A.      I don't -- I don't remember

11   when Holly started her job.  I think that

12   that was probably about after one month.

13       Q.      After one month?

14       A.      Yes, because she was moved,

15   you know, from Birmingham to Dothan,

16   Alabama.

17       Q.      And I believe you testified

18   earlier after Holly Brownell received the

19   FSR position you believe that you had been

20   discriminated against with respect to the

21   FSR position; correct?

22       A.      Yes.

23       Q.      Why at that time did you not

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  file anything, either with the EEOC or

2  through any procedures with Compass Bank?

3        A.      I was very upset and

4  discouraged.  I talked to my many

5  coworkers.  I was told, you know, do not

6  worry, you know, it was not worth it to

7  apply for the position.  So I holded my

8  tongue.  And also later on that year I

9  told, you know, human resources, the

10  representative, that I felt I was racially

11  discriminated.  She didn't say -- she did

12  not do anything.  She did not say anything

13  either.  They just -- and then -- I'm

14  sorry.  Before I talked to her I told, you

15  know, my supervisor I want to quit the

16  job.

17        Q.      Okay.  And that was the

18  time --

19        A.      And then district manager, you

20  know, came to the bank, met me, talked to

21  me.  She told -- she wished I could stay

22  at the bank, continue to work at the bank

23  because she told me I did an excellent

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    job, she liked me so she wished me to

2    stay. So I did stay. I didn't even make

3    complaint. But I did talk to the human

4    resource representative about, you know,

5    this written discrimination. She did

6    nothing and say nothing, because I

7    continue -- I decided to continue to work

8    at the bank, so I didn't say anything

9    either.

10        Q.    Who were the coworkers that

11    you talked to?

12        A.    I'm sorry. Because there is

13    such a high turnover at the bank, I don't

14    remember back to '03 whom I talked to. I

15    believe Adrian maybe Morrison. Just

16    whoever worked there then I talked to. I

17    don't remember who was there --

18        Q.    What positions --

19        A.    -- at that time, you know.

20        Q.    What positions did they hold?

21        A.    Teller and -- yes, teller and

22    assistant teller, maybe a high teller.

23        Q.    Who was the human resources

# ᅚᅵ TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  representative that you mentioned earlier

2  that you saw?

3          A.     Bynum Rogers.

4          Q.     That was the human resources

5  manager that you spoke to about believing

6  you were discriminated against?

7          A.     Well, she is a human resources

8  representative for Montgomery area.

9          Q.     That's the one you talked to

10  about being discriminated against?

11          A.     Yes, which covered the Dothan

12  branch.

13          Q.     And when did you talk to Bynum

14  Rogers?

15          A.     I believe we would have a

16  get-together at the end of '03, maybe

17  around November or October, the year 2003.

18  I don't remember exactly date, but I know

19  it's late '03.

20          Q.     And why did you wait until the

21  end of '03 to talk to Bynum Rogers about

22  feeling discriminated against with respect

23  to the FSR position?

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1        A.      Because that's -- that was the

2    first time, the only time I saw her.  I

3    didn't -- I didn't see her earlier.  I

4    don't know whom, you know, I could talk to

5    besides Bynum Rogers.

6        Q.      Do you believe that you were

7    more qualified than Holly Brownell?

8        A.      Yes.

9        Q.      Why do you believe you were

10   more qualified than Holly Brownell?

11       A.      I believe that I am.  After

12   all, I have, you know, a higher education

13   than she has.  Just same as, you know,

14   before, as I said, same as, you know, when

15   other people get the same position.  I

16   think I have more customer service skills.

17   I have worked at Dothan Main for long time

18   so I'm familiar with all the customers.  I

19   have good customer service skill, solve

20   problem skills.  I was willing to take

21   challenge, but I was not given any

22   opportunities.  I was not given any

23   opportunity to use my knowledge, to

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    maximize my, you know, talent.

2         Q.    Just let me clear one thing

3    up.  I apologize.  I'll try not to go into

4    something you already covered.  But you

5    said after Holly Brownell received the

6    position you believed at that time you

7    were discriminated against; correct?

8         A.    Yes.

9         Q.    What was it at that time that

10   made you think I have been discriminated

11   against with respect to being

12   Asian-American?

13        A.    Because I had been applying

14   for three times.  And I don't know where

15   the application sheet for the other time,

16   but I applied three time, you know.  Every

17   time I was told, you know, someone else

18   has more experience to fill the position,

19   and then they all white.  Just because I'm

20   Asian-American.  And I believe I just was

21   racially discriminated against.

22        Q.    We did talk about another FSR

23   position that was filled by Leslie Webber;

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    correct?

2        A.    Yes.

3        Q.    And Leslie Webber filled the

4    FSR position before Holly Brownell;

5    correct?

6        A.    Yes.

7        Q.    And I have her date of filling

8    that position being in November of 2002.

9    And my question to you is does that sound

10   correct?

11       A.    Yes.  I remember she came

12   later in the year, you know, months before

13   Christmas.  I think that was right.

14       Q.    So there wouldn't have been

15   much time between Leslie Webber having the

16   job and then Holly Brownell filling the

17   job; is that correct?

18       A.    Yes, that's right, because

19   there's, you know, another position open

20   because we have three FSR positions at

21   bank, yes.

22       Q.    And you applied for the FSR

23   position that Leslie Webber received?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        A.     Yes, I did.

 2        Q.     Were you interviewed for the

 3   job that Leslie Webber received?

 4        A.     Yes, I did.

 5        Q.     Who interviewed you?

 6        A.     Regina McNeil.

 7        Q.     Anybody else?

 8        A.     No.

 9        Q.     When did you learn that you

10   didn't receive the FSR position that was

11   filled by Leslie Webber?

12        A.     I believe that I was told at

13   the end of interview, you know, someone

14   else has more experience was going to

15   transfer to Dothan branch and take the

16   position.

17        Q.     Do you believe that you were

18   more qualified than Leslie Webber for the

19   FSR position?

20        A.     I didn't -- at that time I did

21   not know, you know, Leslie Webber.  Yes, I

22   believe, you know, I have an equal, you

23   know, opportunity and qualification than
```

# ⅢⅬ TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

```
 1              for identification.)

 2         Q.    Ms. Lee, let me show you what

 3    I have marked as Defendant's Exhibit 13,

 4    which is a memo to -- it's addressed memo

 5    to you from Jerri Carothers dated on

 6    January 27, 2003?

 7         A.    Yes.

 8         Q.    Regarding a customer service

 9    complaint.  Do you recall receiving a copy

10    of Defendant's Exhibit 13?

11         A.    Yes, I did.

12         Q.    And it appears to me that the

13    handwriting on here, but I need you to

14    confirm, on the bottom of the first page

15    of the exhibit and the second page is your

16    handwriting; is that correct?

17         A.    Yes.  I was told, you know, I

18    could write down my comments, my idea

19    underneath this, so I did.

20         Q.    And do you remember any

21    discussions about this Defendant's Exhibit

22    13 when you received this?

23         A.    I remember I have brief
```

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    Asian-American why he doesn't like you?

2         A.    Yes, because I'm not white.

3    I'm not American.

4                   (Whereupon, Defendant's

5                   Exhibit 14 was marked

6                   for identification.)

7         Q.    Ms. Lee, let me show you what

8    I have marked as Defendant's Exhibit 14,

9    which is a memo addressed to you from

10   Jerri Carothers regarding attendance

11   probationary warning.  Is that your

12   signature at the bottom of the Defendant's

13   Exhibit 14?

14        A.    Yes.

15        Q.    And looks like you received it

16   on January 27, 2003?

17        A.    Yes.  Let me go back to look

18   at the other one.  I have another one.

19   Okay.  When was that?  Okay.  That is

20   November 2002.  Okay, that is right.

21        Q.    And do you recall any

22   discussions about Defendant's Exhibit 14

23   with Jerri Carothers?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1        A.      No.

2        Q.      And do you recall the reasons

3   for any of these absences and tardies that

4   are listed on this document?

5        A.      Well, as I told you earlier,

6   you know, most of the time because of my

7   kid was sick, or some accident happened at

8   the daycare and I left early or come back

9   late a little bit.  But everything is all

10  count absent.

11       Q.      Right.  According to their

12  policy, they keep up with all absences;

13  correct?

14       A.      Yes.  I think supervisor keep

15  the records for this.  So, actually -- I

16  just note this.  I'm sorry.  The

17  difference between this one and this

18  one --

19       Q.      And when you say this one, can

20  you tell me what exhibit number?

21       A.      Exhibit 10.  So I was absent

22  five times.  On this one is absent five

23  times too except tardy, got a twenty
```

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   difference.  But, you know, the occurrence

2   is the same, the occurrences, you know,

3   five occurrences, absences.

4              (Whereupon, Defendant's

5              Exhibit 15 was marked

6              for identification.)

7       Q.    Okay.  Well, let me show you

8   another one.  Here is Defendant's Exhibit

9   15.

10      A.    Well, it doesn't matter.

11      Q.    Your signature is at the

12  bottom of Defendant's Exhibit 15?

13      A.    Yes.

14      Q.    And this one is dated on July

15  21, 2003; is that correct?

16      A.    Yes.

17      Q.    And do you recall any

18  discussions surrounding you receiving this

19  written counseling for attendance?

20      A.    Yes.

21      Q.    What do you recall?

22      A.    I remember discussion with

23  Jerri Carothers.  She told me about this,

## TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

 1    you know.  She was apologize, you know,

 2    for this happen.  You know, I was too,

 3    apologize.  She said, well, just come to

 4    the policy, you know, and you need to sign

 5    this.  I did.

 6         Q.    Anything else you recall being

 7    said?

 8         A.    No.

 9               (Whereupon, Defendant's

10               Exhibit 16 was marked

11               for identification.)

12         Q.    Let me show you Defendant's

13    Exhibit 16, which is a memo to you from

14    Jerri Carothers dated November 19, 2003.

15    Is that your signature at the bottom of

16    Defendant's Exhibit 16?

17         A.    Yes.

18         Q.    And you would have received

19    this on November 21, 2003?

20         A.    Yes.

21         Q.    And do you recall any

22    discussions with Jerri Carothers about

23    Defendant's Exhibit 16 when you received

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  it?

2      A.      Yes, I did.

3      Q.      What do you recall being said?

4      A.      Well, she called me, told me

5  about this, you know, the number of times

6  of absence.  She told me she was

7  understand, you know, things happen, but,

8  you know, if your absence number

9  occurrence is over, you know, look over

10  the policy.  She have to give me this to

11  sign, so I did.

12      Q.      Anything else?

13      A.      No.  I think she said

14  according to the policy she had to give me

15  this to sign.

16              (Whereupon, Defendant's

17              Exhibit 17 was marked

18              for identification.)

19      Q.      Ms. Lee, let me show you

20  Defendant's Exhibit 17, which is a memo to

21  you from Jerri Carothers dated February

22  24, 2004 regarding attendance, written

23  counseling.  Is that your signature at the

# ⅡⅬ TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    bottom of Defendant's Exhibit 17?

2         A.    Yes.

3         Q.    And you would have received

4    this written counseling on March 2, 2004?

5         A.    Yes.

6         Q.    Do you recall any discussions

7    when you received this document?

8         A.    Yes.

9         Q.    What do you recall being said?

10        A.    I think Jerri Carothers just

11   told me, you know, same things, you know,

12   sorry for what happened, but, you know, I

13   need to, you know, be careful, you know,

14   try not to, you know, let it happen again.

15   She understand, of course, the reasons

16   sometimes of what happened, but, you know,

17   so --

18        Q.    Anything else?

19        A.    No.

20        Q.    Now, you mentioned previously

21   that you had -- well, was there a time

22   during your employment that you stated you

23   wanted to resign?

# ⊫ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1        A.     Yes.

2        Q.     And do you recall when that

3   was?

4        A.     I don't remember the exact

5   date and time.

6        Q.     I've got some documents to

7   indicate it was around April 2004.  I know

8   you can't recall exactly, but does that

9   sound about right?

10       A.     Yes.

11       Q.     What was the reason why you

12   wanted to resign?

13       A.     Because I was upset.  I was

14   discouraged for -- you know, for turn

15   down, you know, FSR position.  Also, you

16   know, I just felt I'm over-qualified to

17   doing the teller job.  I was treated

18   unfairly.  Also I was treated without, you

19   know, dignity and respect.

20       Q.     Anything else?

21       A.     No.

22       Q.     How were you treated unfairly?

23       A.     There is a lot of things
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    happen, which give me that feeling.  FSR,

2    position, you know, is one thing.  There's

3    some other things.

4         Q.    And I'm asking for those?

5         A.    Oh, okay.  Well, some things I

6    probably don't remember at this moment,

7    but I can tell you later.  Like, you know

8    drivethrough, working in the drivethrough.

9    Nobody liked to work at the drivethrough

10   because, you know, that is -- there's

11   supposed be two people, two teller work at

12   the drivethrough window.

13            And drivethrough is the

14   busiest place in the whole place, whole

15   bank, you know, because everybody, you

16   know, just love the drivethrough, you

17   know, drive by.  They don't have to get

18   out the car.  They don't have to come in

19   the bank.  It's fast and convenient.  So

20   just many more customers at the

21   drivethrough than the lobby.

22            And then -- but the fact is,

23   you know, most of the time only one person

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    Okay.  I understand that.  But

2    my question is do you recall anything that

3    was in the letter of resignation?  Did it

4    just say --

5    A.    No.  It said I'm sorry to

6    inform you that I decided to leave the

7    Compass Bank.  You know, my last day was

8    blah, blah, blah.  You know, that's it.

9    Q.    Now, how did it come about

10    that you did not resign from Compass Bank

11    that time?

12    A.    Well, other tellers told me,

13    you know, to stay.  Customers told me to

14    stay.  The district manager came to the

15    bank, told me the good job I did.  She

16    asked me to stay.  Bynum, I saw Bynum,

17    human resource representative, so I have a

18    talk with her too.  She wished me to stay

19    too.  So I was encouraged to stay.  And

20    then we have also have Compass club

21    meeting dinner at Old Mill Restaurant in

22    Dothan.  So I was awarded, you know,

23    award, you know, for the -- for the, you

# ▐▐ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  want me to leave.  So I did put that all

2  into consideration.

3          Q.      Why did you tell the customers

4  that you were going to leave?  Were you

5  just telling them your last day would

6  be --

7          A.      Yes, I'm leaving for my last

8  day.

9          Q.      Is the district manager you've

10  been referring to Mona George?

11          A.      Yes.

12          Q.      Tell me what Mona George said

13  to you about wanting you to say?

14          A.      I don't remember the exact

15  words she said, but she said, you know,

16  Shirley, please stay, you know, you did an

17  excellent job, you know, I like you, so

18  please stay for me.  I said, okay.

19          Q.      Anything else you recall being

20  said in that discussion?

21          A.      That's basically what she told

22  me, maybe not same word.

23          Q.      What did you tell Mona George

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   say --
 2         A.     Like a cross --
 3         Q.     Let me finish my question
 4   first.
 5         A.     Oh, I'm sorry.
 6         Q.     It's okay.  It's just
 7   important for the record that I finish my
 8   question.  What type of training did she
 9   say she could help with?
10         A.     Doing the FSR job, the cross
11   training.  She told me she would tell the
12   manager about it and they would do
13   something, training on me, but nobody
14   talked to me.  Nobody did any training.
15         Q.     Okay.  Anything else you
16   recall discussing with Bynum Rogers?
17         A.     No.  That's the only two
18   things basically we talked about.
19         Q.     Why did you decide to stay at
20   Compass Bank?  Was it because these
21   individuals asked you to stay?
22         A.     (Witness nods.)
23         Q.     Is that a yes?
```

# ⅡΕ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       A.      Well, because I worked at a

2   bank for long time.  I liked the

3   customers.  I like my coworkers.  I was

4   still, you know, hoping, you know, one day

5   maybe I will get promoted, get a different

6   position job, which was to me better, so I

7   decided to stay then.

8       Q.      Any other reason?

9       A.      No.

10      Q.      Now, according to my records,

11  in June of 2004 you filed a petition for

12  protection from abuse against your former

13  husband, Mr. Lee.  Does that sound

14  correct?

15      A.      2004?

16      Q.      Yes, ma'am.  June.

17      A.      Yes, I think so.

18      Q.      What was your husband doing at

19  that time that required you to file a

20  petition for protection?

21      A.      He just -- he threaten me, you

22  know, to take my son away from me.  So I

23  thought he -- I believe he was dangerous,

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  so I filed the petition, restraining order

2  against him.

3      Q.    Was that the only thing he

4  did -- that's a lot.  I'm not meaning it

5  that way.  But was there anything else

6  that he did that caused you to file the

7  petition for protection?

8      A.    No.   That's the main reason.

9      Q.    And what was the result of the

10 petition?  Did you go to court, or what

11 happened?

12     A.    Well, the result, we got

13 divorced, so I was awarded divorce and the

14 full custody for my son.

15                (Whereupon, Defendant's

16                Exhibit 18 was marked

17                for identification.)

18     Q.    Ms. Lee, I'm going to show you

19 what I'm marking as Defendant's Exhibit

20 18.  I just have a few questions about

21 this document that's entitled Teller

22 Performance Expectations.  The first

23 question, is that your signature at the

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    bottom of the page?

2          A.    Yes.

3          Q.    And it looks like Jerri

4    Carothers dated it 4/13/04.  Is that about

5    the time in which you signed it?

6          A.    Yes, I think so.  Yes.

7          Q.    Do you recall any discussions

8    about this document at the time you

9    received it?

10          A.    I just remember she told me

11    that just some teller performance

12    expectations, of course, you are aware of

13    this.  I say, yes.  And then she said,

14    okay, just sign at the bottom.  I did.

15          Q.    Do you recall any training

16    that you received by Mona George about

17    loss prevention?

18          A.    I did.  I did remember.  We

19    have a meeting.

20          Q.    And according --

21          A.    Teller meeting.

22          Q.    According to my records, that

23    happened in October of 2004.  Does that

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1    sound correct?
 2         A.    Yes, yes, about that time I
 3    remember.
 4         Q.    What was the training about?
 5         A.    About shortage, overage, you
 6    know, how to prevent the loss.
 7         Q.    What was said about how to
 8    prevent the loss?
 9         A.    Just because she told me it
10    was close to the holiday time.  You know,
11    just be extra cautious about it, fraud
12    activities.
13         Q.    Anything else?
14         A.    And make sure you know -- you
15    knew your delegated authority, and Mona
16    asked me what my delegated authority was.
17    I told her.  I told her -- I believe I
18    told her two thousand dollars, and then
19    she said okay.  But, you know, Jerri
20    Carothers, supervisor, if I was wrong, she
21    should have corrected me then.
22         Q.    Okay.
23         A.    Because it was very serious
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1           (Whereupon, Defendant's

2           Exhibit 19 was marked

3           for identification.)

4      Q.    Ms. Lee, let me show you

5   Defendant's Exhibit 19.  It's my

6   understanding these were documents used by

7   Mona George during loss prevention

8   training.  Would you look through the

9   documents and see if I'm correct, because

10   there's several pages to the document?

11      A.    Yes, I remember she talked

12   about AMERICAN, yes.

13      Q.    Talk about what?

14      A.    You know, AMERICAN.  Each

15   letter represent what is, you know --

16      Q.    Oh, the acronym.  I'm sorry.

17      A.    Yeah.  Check notations,

18   deposit notations.  Yes, we have meeting

19   to talk about this.

20      Q.    And were you given copies of

21   Defendant's Exhibit 19?

22      A.    Yes, I believe I did, yes.

23      Q.    And you will see on the first

1    page at the top it talks about a

2    T-notation.  And then if you look at the

3    third page where it says check notations

4    at the top, you see that check there and

5    it's got an SM/Open Date?

6         A.    Uh-huh.

7         Q.    Do you see that?  You just

8    need to answer yes.  I'm sorry.

9         A.    Yes.

10         Q.    Okay.  Is that the T-notation

11    or the T-bar?

12         A.    Yes.  They call it T-bar, yes.

13         Q.    Okay.  And then I believe

14    below it explains what each one of those

15    items are; is that correct?

16         A.    Yes.

17         Q.    Do you recall during the

18    training that Mona George provided on loss

19    prevention, her talking about any specific

20    fraudulent activity?

21         A.    She went through all of this.

22         Q.    Just so we're clear, when you

23    say this, you're talking about the

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    information in Defendant's Exhibit 19?

2         A.    Right, yes, on Exhibit 19.

3    Yes, she went through all of this, and she

4    show us also some examples of, you know,

5    the mistake, you know, other teller at the

6    other bank, you know, did earlier that

7    year or before.

8         Q.    And do you recall what the

9    mistake was?

10        A.    Well, one example, like one of

11   the teller cash a check, you know, without

12   even signature on there.

13        Q.    When you say signature, you're

14   talking signed at the bottom right-hand

15   corner?

16        A.    Right.  Without customer

17   signature, yes.  The other one is not a

18   check because no routing number.  And some

19   others.

20        Q.    Do you remember what the other

21   examples were?

22        A.    No.

23        Q.    Do you remember if she showed

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   any pictures of individuals who might be
 2   conducting fraudulent activity with
 3   checks?
 4         A.     Not a picture, you know, of a
 5   criminal who did this fraudulent activity.
 6   I don't remember her showing the picture.
 7         Q.     You don't remember seeing
 8   that?  I'm sorry, Ms. Lee, I just didn't
 9   understand your testimony.
10         A.     Yes.   No, I don't remember
11   seeing it.
12         Q.     Okay.  Do you know whether she
13   showed the group pictures of people who
14   were actually doing the fraudulent
15   activity with the checks?
16         A.     I know she talk about, you
17   know, this, you know, these people, you
18   know.  There's a group of people, you
19   know, have been doing this, you know, at
20   the different bank, different locations,
21   but I don't remember their names or, you
22   know, the pictures.
23         Q.     You just don't remember
```

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    whether she showed them or not?

2         A.    She showed us --

3         Q.    I'm being specific about the

4    pictures?

5         A.    I don't remember.

6         Q.    Okay.

7         A.    I don't remember what they

8    look like.

9               (Whereupon, Defendant's

10              Exhibit 20 was marked

11              for identification.)

12        Q.    Ms. Lee, let me show you what

13   I'm marking as Defendant's Exhibit 20,

14   which is a two-page exhibit.  It's Bates

15   labeled 084 and 085.

16        A.    Right.

17        Q.    Do you recognize these as the

18   two checks that you handled as a teller --

19        A.    Yes.

20        Q.    -- that resulted in the loss

21   of three thousand dollars in the bank?

22        A.    Yes, fifteen hundred each,

23   yes.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          Q.        Right.    And help me out here
2     because I'm not a teller, okay?
3          A.        Okay.    Sure, sure.
4          Q.        I have done a lot of work for
5     Compass Bank, but I may be a little slow
6     on this.    How can you tell that you are
7     the one who handled these checks?    Do you
8     have a teller number that gets put on the
9     check?
10          A.        Yes.    I was going to say --
11     yes, I'm teller number seven.    So you can
12     see -- the 728, that's my number.
13          Q.        Okay.
14          A.        At the bottom of the check
15     above the memo line.
16          Q.        And, obviously, this is a
17     front cover and back cover of the checks.
18     And there's the signature for the
19     individual.    What is the number under
20     Cheryl Alleman, the name there, Cheryl
21     Alleman, that's on the back of the check?
22     Starts with an S.    What is that number?
23          A.        That's --

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1         Q.      Is  that  a  Social  Security
2    number?
3         A.      Social  Security  number  and
4    license  number.
5         Q.      And  driver's  license  number  is
6    below  that  I  guess?
7         A.      Yes.
8         Q.      And  on  the  bottom  of  the  first
9    page  of  Defendant's  Exhibit  20  there  is
10   some  handwriting  there.   And  I'm  not  sure
11   if  you've  ever  seen  this  handwriting  or
12   not,  but  it's  my  understanding  it's  not
13   your  handwriting  anyway  because  it  says
14   talked  to  Shirley.   That's  not  your
15   handwriting,  though,  Ms.  Lee?
16        A.      No.   That's  Jerri's
17   handwriting.
18        Q.      Okay.
19        A.      Jerri  my  supervisor,  Jerri
20   Carothers.
21        Q.      And  I  believe  I  saw  somewhere
22   that  it  was  brought  to  your  attention
23   about  the  loss  to  the  bank  from  these  two
```

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1   checks.  It was brought to your attention
 2   on December 30, 2004.  Does that sound
 3   right?
 4        A.     Yes.
 5        Q.     Can you tell me what
 6   discussions you had with Jerri Carothers
 7   or others about these checks?
 8        A.     Well, Jerri, you know, just
 9   walked to my window and told me, you know,
10   about this loss in front of everybody.
11   Other tellers heard it too.  One customer
12   at Phyllis window heard it too.  She told
13   me, you know, she couldn't believe, you
14   know, that I did that.
15        Q.     I'm sorry.  Could you repeat
16   that last phrase?
17        A.     She said, you know, she
18   couldn't believe that I did that.  One is
19   understandable, and I have two.  And then
20   that just, you know, ridiculous.  So she
21   told me about it.
22        Q.     And you may have told me the
23   best you can recall what she said, but I
```

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    I believe early, early January

2   or maybe late December '04, late

3   December -- late December '04 or early

4   January '05.  I don't remember the date.

5        Q.    Any other discussions you had

6   with Jerri --

7        A.    No.  No, I didn't have another

8   one.

9        Q.    And I'm saying until you were

10  informed of the termination decision?

11       A.    Right.  No, I did not have

12  another discussion or meeting.

13       Q.    Okay.  Going back to the

14  checks, Defendant's Exhibit 20, there's no

15  T-bar on the checks; correct?

16       A.    Right.

17       Q.    And why is that?

18       A.    It was very busy day, you

19  know, short-handed.  You know, she is

20  customer.  I just forgot.

21       Q.    And you're saying she's a

22  customer, but she really wasn't a

23  customer; correct?

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    Q.    I'm sorry.  Repeat that.

2    A.    Yes, I did.  Yes, I do

3    remember what happened then.  But I don't

4    remember the one I did earlier.

5    Q.    Okay.  Is there any reason why

6    you remember this specific check, the

7    first one on Defendant's Exhibit 20?

8    A.    Well, because I was suspicious

9    about this little bit.  But then the

10   supervisor was at lunch, so she was not

11   there.  I was so busy, so I didn't do --

12   that's why I didn't do the T-bar.  And

13   then she has I.D., so I just continue.

14   And she is a bank customer, so bank

15   customer is not required to do the

16   thumbprint.  So, I mean, so I cashed the

17   check.

18   Q.    What kind of I.D.?  Did she

19   have a driver's license?

20   A.    Yes, she had a driver's

21   license.

22   Q.    What was the race of the

23   person who was acting like she was Cheryl

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Alleman and presented the check to you?

2         A.    She was a black lady.

3         Q.    Do you know what race Cheryl

4    Alleman is?

5         A.    She is black too.

6         Q.    The actual Cheryl Alleman is

7    black is your understanding?

8         A.    Uh-huh.

9         Q.    Is that a yes?

10        A.    Yes, yes.

11        Q.    Do you remember anything about

12   the lady who was impersonating Julie

13   Brannon and presented the check to you?

14        A.    Actually, I didn't, because

15   that happened, you know, several months

16   ago.  I mean, that's much earlier, you

17   know, '04.

18        Q.    You don't remember her?

19        A.    No, I don't remember.

20              (Whereupon, Defendant's

21              Exhibit 21 was marked

22              for identification.)

23        Q.    Ms. Lee, I'm now showing you

# ⲔⲈ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Defendant's Exhibit 21, which I believe is

2   a document you referenced earlier.  This

3   is a memo to you from Regina McNeil and

4   Jerri Carothers dated January 20, 2005.

5   Is this the written notice of termination

6   from employment?

7        A.    Yes.

8        Q.    And you were -- I stopped you

9   earlier because I knew we were going to

10  get to it.  But tell me the circumstances

11  and discussions you had with either Regina

12  McNeil or Jerri Carothers at the time of

13  your termination when you were presented

14  with this document?

15       A.    Sorry?

16       Q.    It was a long question.

17       A.    Yeah.

18       Q.    Tell me what happened leading

19  up to your termination and receiving that

20  document?

21       A.    That's on January 28th.

22  That's different day from the date I was

23  terminated, so --

# ΓΙΕ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          for identification.)

2          Q.    Ms. Lee, I'm now showing you

3    what I have marked as Defendant's Exhibit

4    22, which is a letter dated February 1,

5    2005.  It appears to be from you to Bynum

6    Rogers; is that correct?

7          A.    Yes, yes.

8          Q.    And you wrote this letter;

9    correct?

10         A.    Yes.

11         Q.    That's your signature on the

12   last page?

13         A.    Yes.

14         Q.    And it's got a CC there,

15   Alabama Department of Industrial Relations

16   and the Civil Rights Center in Washington,

17   D.C.  Now, did you send this letter to

18   these two places as well?

19         A.    Yes, I did.

20         Q.    Now, I've got some records

21   relating to the Department of Industrial

22   Relations, but did you ever hear any

23   response back from the Civil Rights Center

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          Q.     It's the second sentence

2    there.  I worked for the bank for some

3    four years and was fired on January 28,

4    2005 for an error that is common.  And I

5    was just wondering what error you're

6    talking about there?

7          A.     For cash a check without doing

8    the T-bar.

9          Q.     And then it says, whites who

10   commit this error are not terminated.  Who

11   are the whites that you're referring to?

12         A.     Tiffany Davis.

13         Q.     Okay.  Anybody else?

14         A.     Not that I know.  Not the

15   branch that I work.

16         Q.     Okay.  When did Tiffany forget

17   to do the T-bar or not do the T-bar?

18         A.     I don't know the date.

19         Q.     How did you know that Tiffany

20   did not do a T-bar?

21         A.     Oh, I know.  She caused a

22   loss, too.  She cashed a check which

23   turned out to be counterfeit check.  So

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    evidently she did not check the signature.

2    She did not ask approval for the

3    supervisor to sign the check.  So she was

4    against the policy too.  And the result is

5    the same, you know, caused a loss.  Of

6    course, you know, nobody is saying

7    anything.  I just found out later on.

8            Q.    How did you find out?

9            A.    From a friend, from her

10   friend.

11           Q.    Who is that?

12           A.    From Tiffany's friend.  I

13   forgot her name.

14           Q.    How do you know her friend?

15           A.    Because her friend work at the

16   bank too.

17           Q.    Oh.  So you learned from

18   people who worked at the bank?

19           A.    Yes.

20           Q.    And you don't remember their

21   name?

22           A.    It was a new teller.  Because

23   it was a new teller, I don't remember.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1        Q.      Oh.

2        A.      You know, it's a new teller.

3        Q.      You never had any discussions

4    with Tiffany about it, though?

5        A.      Of course not.

6        Q.      And was this with just one

7    friend of Tiffany's you discussed this

8    with?

9        A.      No.  And then later on I heard

10   it from other teller.

11       Q.      Who was that?

12       A.      Phyllis.  The new teller last

13   name is Brankin.

14       Q.      Say that again.  I'm sorry.

15       A.      Brankin.

16       Q.      Brankin?

17       A.      Brankin, yes.  I forgot her

18   first name.

19       Q.      And they are the ones that

20   told you that Tiffany had a loss as a

21   result of failing to do the T-bar?

22       A.      Right.

23       Q.      When did they tell you this?

# ⅡE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  ever tell you what discussions, if any,

2  that management had with Tiffany Davis

3  about the loss?

4      A.    No, they did not tell me, you

5  know, the content in the meeting between

6  Tiffany and manager.

7      Q.    I'm sorry. What was the last

8  part you said?

9      A.    They did not tell me the

10  content of the meeting between Tiffany and

11  manager.

12      Q.    Okay.

13      A.    They just, you know, saw the

14  result, you know, the fact, obvious fact.

15      Q.    Do you know of any Compass

16  Bank employees who have been fired for a

17  loss after not doing a T-bar or verifying

18  signatures, other than yourself?

19      A.    Oh, it's happened before.

20  This is not the first time.

21      Q.    And who --

22      A.    It's happened all the time.

23      Q.    Who has been fired for that?

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        A.      I don't know.  I don't know
 2   them.
 3        Q.      Okay.
 4        A.      At Dothan Main I don't know.
 5   I mean, you know, I'm the -- I'm the only
 6   one that was fired there.  I don't know,
 7   you know, what happened at other branch.
 8                (Whereupon, Defendant's
 9                Exhibit 25 was marked
10                for identification.)
11        Q.      Ms. Lee, let me show you
12   Defendant's Exhibit 25, which is the
13   complaint you filed in this action.  If
14   you will, turn to the second page of the
15   document, paragraph number seven, that
16   states that the Defendant's agents,
17   Plaintiff's supervisor, disciplined her in
18   a manner not used to discipline white
19   employees which was humiliating and
20   insulting.  Is that something that we've
21   talked about?
22        A.      Yes.
23        Q.      And could you just -- without
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    going into all the detail of it, could you

2    just briefly tell me what you're referring

3    to there?

4               MR. NEWMAN:   Even though we

5    have already talked about it?

6               MR. KAUFFMAN:   Yeah.   I just

7    want -- just whatever -- a glimpse of it,

8    just to make sure we have talked about it.

9         A.    Just the way they, you know --

10   between -- between me and Tiffany Davis.

11        Q.    Okay.  And paragraph eight

12   says, management at plaintiff's place of

13   employment habitually treated any

14   minority, African-American, Asian,

15   different from the treatment whites

16   received.  Have we also discussed all ways

17   in which management did that?

18        A.    Yes, I think we have already

19   covered that.

20        Q.    That's good.  That saves us

21   time.  All right.  I am looking at your

22   answers to some requests for production.

23   I will just go ahead and mark them.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1      A.      No, I don't have a copy, but I
2   have -- well, I'm sorry.  It may be in the
3   employee handbook.  I have seen this one
4   before.
5      Q.      When would you have seen that?
6   Some time during your employment it was
7   given to you?
8      A.      Yeah, some time in the
9   employment.  I think in the beginning of
10  employment I was given a copy of this.  I
11  just have never, you know, have discussion
12  with anybody about it.
13     Q.      Ms. Lee, when did you become a
14  U.S. citizen?
15     A.      In the year 2001.  No.  2002.
16     Q.      It was after you began
17  employment with Compass Bank; is that
18  correct?
19     A.      Yes, that's right, after.
20     Q.      And did somebody -- did the
21  bank throw you a party or something or
22  have a cake or something when you obtained
23  your citizenship?

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1          A.      Actually, I think Jerri did.

2    Jerri Carothers did, yes, did give me

3    welcome meeting -- I mean, a party, small

4    party, yes.

5          Q.      Was there a cake at the party?

6          A.      I have a cake.  I have -- you

7    know, everybody bring a dish, you know,

8    covered dish from home.

9          Q.      Was it lunchtime?

10         A.      Yes, at lunchtime, yes.

11         Q.      And that was in honor of you

12   becoming a U.S. citizen?

13         A.      Yes.

14         Q.      Did Ms. Carothers ever help

15   you or offer any assistance with respect

16   to your problems that you were having with

17   your ex-husband, Mr. Lee?

18         A.      You know, because she sit just

19   beside my window we have some causal

20   conversations, but she never really -- we

21   never sit down.  She asked me what the

22   problem is, if there was anything she

23   could help me or assist with, you know.

# ℡ TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

```
 1              (Whereupon, Defendant's

 2         Exhibit 31 was marked

 3         for identification.)

 4      Q.      Let me show you what I'm

 5  marking as Defendant's Exhibit 31.

 6      A.      Okay.

 7      Q.      It is a memo to Shirley from

 8  Jerri Carothers.  And my understanding,

 9  just so you know, this document -- it's my

10  understanding this document was never

11  given to you.  It was a draft of a written

12  counseling.  And it relates to an employee

13  meeting where service standards were

14  discussed about not taking personal calls

15  wherein you were talking to -- while

16  talking to customers.  Do you recall a

17  meeting wherein it was discussed about

18  service standards and not taking personal

19  calls while waiting on customers?

20      A.      We have general meeting.  The

21  supervisor have meeting with every teller.

22      Q.      Do you recall ever been talked

23  to or counseled about taking a personal
```

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   call when you were waiting on a customer?

2        A.      No, I don't remember on this

3   one.

4        Q.      And the date of this is in

5   April of '04, which is I believe very

6   close to the time period in which you

7   expressed an intent to resign from the

8   bank at one time.  Do you know if

9   there's --

10       A.      Yes, that's right.

11       Q.      Okay.  Do you recall ever

12  being counseled about being on a personal

13  call while waiting on a customer close to

14  the time when you expressed your intent to

15  resign?

16       A.      That's right.  I remember now.

17  My memory, you know, just refreshed.  I

18  remember.  That's right.  Actually, that

19  was one of the reasons I resign because I

20  was -- I was, you know, treated wrong,

21  treated unfairly.

22       Q.      Tell me what happened.  Tell

23  me what discussions either Ms. McNeil or

# ⅡⒺ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1              C E R T I F I C A T E

 2

 3

 4    STATE OF ALABAMA)

 5    JEFFERSON COUNTY)

 6

 7              I hereby certify that the

 8    above and foregoing deposition was taken

 9    down by me in stenotypy, and the questions

10    and answers thereto were reduced to

11    typewriting under my supervision, and that

12    the foregoing represents a true and

13    correct transcript of the deposition given

14    by said witness upon said hearing.

15              I further certify that I am

16    neither of counsel nor of kin to the

17    parties to the action, nor am I in anywise

18    interested in the result of said cause.

19

20

21

22            Heather Spier

23    COMMISSIONER - NOTARY PUBLIC
```

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

SHIRLEY Z. LEE,              *

          PLAINTIFF,      *

                            *

VS.                      *     CASE NO.: 1:05-CV-717-A

                            *

COMPASS BANCSHARES, INC.,    *

                            *

          DEFENDANT.     *

## PLAINTIFF'S ANSWER TO DEFENDANTS FIRST SET OF INTEROGATORIES

1. Yuling Zhou, Yuling Lee, Shirley Lee, or Yuling Tidmore
   Address:

   (April 1999 - present)

   (April 1998-April 1999)

   (October 1997-April 1998)

   June 1996-October 1997



   August 1995-June 1996

2. SSN:

3. Beijing Huang Cheng Gen Elementary School
   (1970-1976)

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
Dothan, AL. 36302-6137

Redacted

RECEIVED
OCT 3 1 2005
BY:_____

Beijing XiSi Middle School Beijing, P.R. China
(1976-1982)

University of International Business and Economics, Beijing, P.R. China
B.A., degree on International Trade
(1982-1987)

Troy State University, Troy Alabama
M.B.A. on Business Administration
(1993-1995)

4. Randy Tidmore
   Married 10 months

   Stephen Lee
   Married 7 ½ years

5. Calvary Baptist Church

   To share the gospel news about Jesus Christ with the world as well as the

   local community.

6. Compass Bank (April 2001- January 2005)
   Position: Senior Teller
   Supervisor: Jerri Carothers
   Pay rate: $8.15/hour
   Reason for leaving: discharged

   New Canton Resturant (February 2000 – February 2001)
   Position: owner
   Salary: $27,000/year
   Reason for leaving: business was sold

7. 2004 Salary: $16,782.00/year
   2003 Salary: $16,552.00/year
   2002 Salary: $16,222.75/year

   Other benefits includes: 13 paid vacations
                            6 paid national holidays
                            Medical insurance
                            Dental/Vision Plan
                            Optional Life Insurance
                            Optional Accidental Death and Dismemberment
                            Spouse/Child Life Insurance
                            Medical spending account

401K retirements plan
Paid family emergency/sick leave

8.  Filed Bankruptcy Chapter 7 on September 7, 2001
    Case #01-03044-DHW-7

9.  None

10. None

11. None

12. From the year 2001 to present, the only employer I had was Compass Bank,

    Dothan, AL. During the time that I was employed, I had applied for the

    position of FSR (Financial Service Representative) three times. The

    approximate time was: 10/2002, 06/2003, and 11/2003.Each time, I was

    turned down based on the decision of the branch manager because she told me

    that she had a better candidate than me.

13. Because of the all the humiliation and insult to me caused by the

    Defendant, I request compensation of app. $5,000,000.000 because:

    1)  Three years salary differences between a teller and a FSR is
        $30,000.00
    2)  My discharge was based on race discrimination.

    I will have and have had difficulty getting another job from any other

    financial institution. Unfortunately, almost all my work history and

    specialties are with the banks. Starting a new and different career means that I

    will have to start from the bottom with the lowest paying rate. Also, during the

    3 years and 10 months of employment with Compass Bank, the managers

    denied me any opportunity to advance my career, which did not comply with

    the bank policy. So, I have wasted 3 years and 10 months with Compass

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
Dothan, AL. 36302-6137

Bank, Dothan, Main Branch. Therefore, I am entitled to get compensation for this.

   3)  Physical and mental damages:

Because of constant stress from the job and managers, because of denial on each job bid, because of opportunities were given to less qualified white people, who were new, had no experiences but were fond by managers for training as vault teller (Head teller used by other banks) assistant, because of the many times I was scolded in front of everybody, etc. I have been humiliated and hurt, which caused a chronic ulcer-like stomach pain (see doctor's report) and depression. I was given Zoloft on September 28, 2005 for depression treatment. Because of all the above reasons, I an entitled to compensation.

   4)  Relocation costs

14. None

15.

   I own the above property.

16. I've provided my degrees. Look at the education/degrees of those hired or promoted over me; these are the documents.

18. A) Financial Service Representative
    B) 10/30/2002; 06/03/2003; 11/03/2003
    C) Nov. 6, 2002; 06/10/2003; 11/13/2003
    D) Jennifer; Leslie Webb; Holly Brownell
    F) Regina Mc Neil as well Jerri Carothers (for her opinion)

19. First Med of Dothan
    1245 Westgate Parkway
    Dothan, AL 36303

                                     Redacted

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
Dothan, AL. 36302-6137

Gastroenterology Assoc. of Dothan
480 Honeysuckle Road
Dothan, AL 36303

Family Health Clinic
545 West Main Street
Dothan, AL 36301

Southern Bone and Joint Specialist PC
1500 Ross Clark Cir.
Dothan, AL 36301

_Shirley Lee_

Shirley Lee

Malcolm R. Newman, Attorney, P.C.

_Malcolm R. m_

Malcolm R. Newman (NEW017)
Attorney for Plaintiff
P.O. Box 6137
Dothan, Alabama 36302
(334) 792-2132
ASB-2826-M39M

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
Dothan, AL. 36302-6137

# CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing upon:

Douglas B. Kauffman, Esq.
Brent T. Cobb, Esq.
Balch & Bingham, LLP
P.O. Box 306
Birmingham, Alabama 35201-0306

by placing a copy of the same in the United States mail, postage prepaid this the 27th day of October, 2005.

_Malcolm R. N_____
Malcolm R. Newman

DEFENDANT'S
EXHIBIT

4

Teller:_____Shirley Lee_____    Review Period:___4-30-01____/___4-30-02___

## Teller Performance Expectations (Annual)

Employees are expected to consistently meet and occasionally exceed the standards set for this position in a competent and reliable manner. The following is a representation of proficient performance. Teller Standards direct perimeter issues of performance and employment.

**#1 Shorts/Overs:** Teller cash drawers are expected to be in balance at all times. Proficient status assigns an out of balance cumulative appraisal period tolerance of $10.00 per day worked.

**#2 Other Losses:** Tellers are expected to adhere to deposit acceptance and check cashing policies in accordance with guidelines assigned to the individual teller. Responsibilities include, but are not limited to, a review of deposited items, the checking of endorsements, signature verification and balance availability. Losses are charged to the teller only when policies are not followed. Proficient status assigns a cumulative appraisal period loss tolerance of $10.00 per day worked.

**#3 Customer Service:** Tellers are the window through which most of our organization is viewed. As such, tellers are expected to project a positive, competent and pleasant manner that has at its base, courtesy and respect for our customers. Customer interaction is to be non-confutational, with problematic issues referred to immediate supervisors for resolution.

**#4 Referrals:** The sale of products and services is paramount to the success of the bank with front line recognition of customer needs at its core. Teller interaction with customers is to be sufficient enough to produce at least _3_ referral per day worked. A referral is defined as a customer with a need, an interest and the ability to purchase the product for which they are referred.

**#5 Other:** Individual tellers are given specific duties to perform. The way they complete their tasks can have either a positive or negative effect on the branch as a whole. Assigned duties are expected to be completed accurately and in a timely fashion. Flexibility and cooperation with management are required elements as is arriving on time on days worked. A positive disposition, a sense of urgency and a professional demeanor are essential elements of the position.

_elj lee_  6/4/01
Teller/Date

_Jerri Carruthers_  5-16-01
Supervisor/Date

**DEFENDANT'S EXHIBIT 6**

PENFAD 800-831-6989

**DELEGATED AUTHORITIES - Teller**

Effective **11-28-01** the following authority is delegated to you based on your demonstrated proficiency. Use good judgement; these limits do not determine whether a loss is charged as policy or non-policy. If sufficient authorities are not available at officer level for a given transaction, verbal approval must be obtained from the next management level or the responsible account officer.

| Total Cash Drawer Limit: $ 7000°° | Exception Cash Limit: $ | Maximum Top Drawer Limit: $ 4000°° | Traveler's Cheque Limit: $ |
|---|---|---|---|

**Tier 8**

| | | | | |
|---|---|---|---|---|
| **CASH PAIDS ON-US ITEMS** | Maker & Payee are the Same | | | |
| | Two-Party *Personal* Checks | $1,000 | N/A | N/A |
| | Two-Party *Business* Checks | $1,000 | $500 | N/A |
| | Cashier's Checks | $1,000 | $1,000 | N/A |
| | Savings Withdrawals | $1,000 | $1,000 | N/A |
| **CASH PAIDS TRANSIT CHECKS** | Other Banks' Two-Party Checks | $1,000 | N/A | N/A |
| | Other Banks' Cashier's Checks | $1,000 | N/A | N/A |
| | Government Checks | $1,000 | N/A | N/A |
| | Savings Bonds | $1,000 | N/A | N/A |
| | Traveler's Cheques | $1,000 | $1,000 | N/A |
| | Cash Advances | $1,000 | $1,000 | N/A |
| **MISCELLANEOUS** | Deposit Acceptance | $3,000 | $1,000 | N/A |
| | Funds/Wire Transfers | $1,000 | N/A | N/A |
| | Exception Wires | $5,000 | N/A | N/A |
| | Paying Through Uncollected | $0 | N/A | N/A |
| | Fee Reversals/Waivers | $1,000 | N/A | N/A |
| | Telephone Transfers (if applicable) | ▬▬ | N/A | N/A |
| | Interbranch Transactions (IOT/IBT) | $1,000 | N/A | N/A |
| | Operating Loss Approved | $1,000 | N/A | N/A |
| | Operational Overdraft | $500 | N/A | N/A |
| | Paying Through Holds | $500 | N/A | N/A |
| | TeleCheck Override | $500 | N/A | N/A |
| | Other General Ledger | No | N/A | N/A |
| | Cashier's Check Signing Authority | $50 | N/A | N/A |
| | | $5,000 | N/A | N/A |

igning this Delegated Authorities form, I agree to perform only those authorized transactions which are necessary to do my job and which are within the limits ished for bank authorized official duties. I acknowledge that all activities performed by me are traceable to me and they are monitored. I understand my ated authorities as detailed on the front of this form and that they supersede all previous authorities.

| ee's Name (printed): hicley Lee | Manager's Name (printed): Jerri Carothers |  11-28-01 |
|---|---|---|
| ee's Title 41 Time Teller | Manager's Title CSM | |
| ee's Signature _Sh Lee_ | Manager's Signature Jerri Carruther | |
| ee's Social Security # | Date: 11/28/01 | Date: 11/28/01 |

Redacted

SEP-13-2002 FRI 05:13 PM CC...SS BANK

**DEFENDANT'S EXHIBIT**
8

PENGAD 800-631-6989

BID APPLICATION

To Be Completed by Human Resources

# ⓒ Compass Bank    9/13/02

| Date Received | Requisition Number |
|---|---|
| | 4 3099 |

## To Be Completed By Employee

| Name | Social Security Number | Extension |
|---|---|---|
| Shirley Lee | | 7022 |

| Current Position | P/T ☐ F/T ☒ | Date of Hire 04/30/01 | Date Current Position teller | Present Department Retail Dept |
|---|---|---|---|---|

| Position Desired | P/T ☐ F/T ☒ | Job Posting Number I. S. R. | Department Retail |
|---|---|---|---|

Home Phone # or Contact # (for those who work evenings)

Please State Your Qualifications for the Position You Are Seeking (Resume could be added as an option if employee has one)

4 Yrs' experience of Retail Banking (more than 1 year w/ Compass Bank.)
Good written or oral communicatin skill, and P.C. skill
Bachilor's degree on Business/Housekeeping; persistent, etc.

| Employee Signature Shirley Lee | Date 9/12/02 |
|---|---|

## *To Be Completed by Employee's Supervisor

| Date of Last Performance Appraisal 4-16-02 | Rating P | Date of Prior Performance Appraisal | Rating |
|---|---|---|---|

Is this employee in good standing or performing in a proficient manner at present?     Yes ☒ No ☐

Is this employee's attendance record satisfactory?   Yes ☐  No ☒   Comments 4 occurences

Does this applicant meet at least the minimum qualifications for the posted job?
Yes ☐  No ☐  HR Should Determine ☒

Are there any job related reasons why this employee should be placed in the position for which he/she has applied?
Yes ☐  No ☒  Comments  Referral good

Are there any job related reasons why this employee should not be placed in the position for which he/she has applied?
Yes ☐  No ☒  Comments

| Supervisor Signature Jerry Carother | Extension 7009 | Date 9-13-02 |
|---|---|---|

### Print below

| To Be Completed By Human Resources If not placed in the position, state reason | Job Code | Promo Inc $ | % 0.00% |
|---|---|---|---|
| | Effective Date: | Merit Inc $ | % 0.00% |
| | | TOTAL INC | % 0.00% |
| | Dept No. | Site Code | Grade |
| | Next Perf Date | New Salary | |

Name of Employee Selected (if another employee is selected)

Print & Save

| Start Date | Other Comment |
|---|---|
| Human Resources Signature | Date |

Redacted

MAR-4-05 FRI 9:11 AM  COMPASS BANK HR      FAX NO. 1334409/403      P. 1


# Compass Bank

P.O. Box 2006
Dothan, Alabama 36302
334 712-7030
www.compassweb.com

**To:** Shirley Lee

**DEFENDANT'S EXHIBIT**
**10**

**From:** Jerri Carothers

**Date:** November 5, 2002

**Re:** Attendance – Written Warning

Shirley, we have discussed your overall attendance performance and the importance of you being at work and on time during your scheduled time periods. On September 19, 2002 you were placed on Verbal Counseling for your attendance. Unfortunately, since this counseling, you have been absent on October 15th and 16th. Under the Attendance Policy, you are being placed on the Written Warning stage of discipline.

A review of your attendance reveals the following absence occurrences:

<u>Occurrences: Absence</u>
No. 1: December 5, 2001
No. 2: April 8, 2002
No. 3: May 28, 2002
No. 4: September 9, 2002
No. 5: October 15, 2002 (half day) & October 16, 2002

Shirley, you must immediately improve your attendance. It is only due to management not addressing this sooner in writing that you are not being placed on Probation. Under our Attendance Policy, you currently have enough absences to be on Probation.

I am here to support you anyway I can, but ultimately it is your responsibility to maintain an acceptable level of attendance. Further absences or tardies within the next 12 months will result in further disciplinary action, including immediate termination of your employment with Compass Bank.

Please sign below acknowledging receipt of this memorandum:

_Shirley Lee_
Associate's Signature

_11/06/02_
Date

CC:    Human Resources

Compass/Lee
018

9-17-02

Ms. Willie Lee Pittman came into the bank and had a complaint on Shirley Lee.   Ms.
Pittman had come thru drive in on Monday afternoon about 4:30.    Shirley asked her if
she had an account here and she said no.   Shirley told her there would be a $3 fee.   Ms.
Pittman said OK because she did not have time to go to her bank.    Ms. Pittman said that
Shirley waited on about 5 cars after informing her of the $3 fee before cashing the check
for Ms. Pittman.   Ms. Pittman felt that it was because she was black and was not dressed
very well at the time.

I thanked Ms. Pittman for making me aware of the situation and assured her that I did not
think Shirley intended to make her feel that way.   I addressed the situation with Shirley.
on 9-19-02.

DEFENDANT'S
EXHIBIT
11
PENGAD 800-631-6989

JAN-17-2003 FRI 04:34 PM C ASS BANK                    FAX NO. 33^ 27032              P. 01



PENGAD 800-631-6989

**DEFENDANT'S EXHIBIT**

12

**BID APPLICATION**

# Compass Bank

To Be Completed by Human Resources

| Date Received | Requisition Number |
|---|---|
| 1-17-03 | 44360 |

## To Be Completed By Employee

| Name | Social Security Number | Extension |
|---|---|---|
| Shirley Lee | | 3022 |

| Current Position P/T ☐ F/T ☒ | Date of Hire | Date Current Position | Present Department |
|---|---|---|---|
| Teller | 4-30-01 | 4-30-01 | Retail / Teller |

| Position Desired P/T ☐ F/T ☒ | Job Posting Number | Department |
|---|---|---|
| Financial Service Representative | 44360 | Retail |

Home Phone # or Contact # (for those who work evenings)

Please State Your Qualifications for the Position You Are Seeking (Resume could be added as an option if employee has one)

I am a hand worker and I am self motivated. I have experience in dealing with the Compass Accounts being a teller, and I have a relationship with many of the customers. I also have a Bachelor's Degree in Business Administration.

| Employee Signature | Date |
|---|---|
| Shirley Lee | 1-17-03 |

## *To Be Completed by Employee's Supervisor

| Date of Last Performance Appraisal | Rating | Date of Prior Performance Appraisal | Rating |
|---|---|---|---|
| 4-30-01 | Proficient | N/A | |

Is this employee in good standing or performing in a proficient manner at present?     Yes ☒   No ☐

Is this employee's attendance record satisfactory?    Yes ☐   No ☒    Comments   within coaching

Does this applicant meet at least the minimum qualifications for the posted job?

Yes ☐   No ☐   HR Should Determine ☒

Are there any job related reasons why this employee should be placed in the position for which he/she has applied?

Yes ☐   No ☐   Comments

Are there any job related reasons why this employee should not be placed in the position for which he/she has applied?

Yes ☐   No ☐   Comments

| Supervisor Signature | Extension | Date |
|---|---|---|
| Jenni Cassiners | 7005 | 1-17-03 |

## Print below

| To Be Completed By Human Resources | Job Code: | Promo Inc $ | % 0.00% |
|---|---|---|---|
| If not placed in the position, state reason | Effective Date: | Merit Inc $ | % 0.00% |
| | | TOTAL INC $ | % 0.00% |
| | Dept No. | Site Code | Grade |
| | Next Perf Date | New Salary | |

Name of Employee Selected (if another employee is selected)                    Print & Save

| Start Date | Other Comment |
|---|---|
| Human Resources Signature | Date |

Redacted



DEFENDANT'S
EXHIBIT
13

PENGAD 800-631-6989

# Memo

**To:** Shirley Lee

**From:** Jerri Carothers

**CC:** Regina McNeil

**Date:** 01/27/03

**Re:** Customer Service Complaint

---

This memo is to go over the customer service complaint that Sybille received from Bernard Petit.

Mr. Petit was upset that he had to wait to long in the drive in. He said that when he complained about the wait being to long that you told him that he could go inside if he didn't want to wait. He said that he told you that going inside was not possible since there was a car in front of him and one behind him. Mr. Petit feels that customer service has declined at both branches over the last few months. I know that we have been short at times but it is important that we acknowledge our customer's frustrations and try to always be pleasant.

It is not a matter whether we are short or not, I am always busy on Thursday and I always work alone on Thurs. I am always pleasant to Customers, even though they are not friendly sometimes. In this particular case. I did not recall I said something like that to him (Mr. petit), actually. I never have said that to anybody in terms of awaiting, Someone (He) might be misunderstand me, he made up the story because he eighter dislikes me or a racidist. I'd like to talk to him personally to find out

Compass/Lee
021

why he was offended if I could. (allowed)

Besides these, I don't know managers are aware of this or not, I hear compliments from customers everyday, they appreciate my friendly & fast service, but I don't rule out the possibilities that few people don't like the way I work or dislikes me period. I am still learning and keep improving myself, always.

Sincerely,

Shirley Lee

 **Compass Bank**

Compass Bank
P. O. Box 2006
Dothan, Alabama 36302
334-712-7000



DEFENDANT'S
EXHIBIT
14

**TO:**      Shirley Lee

**FROM:**    Jerri Carothers

**DATE:**    January 27, 2003

**SUBJ:**    **Attendance – Probationary Warning**

Shirley, on November 5, 2002, we discussed your overall attendance performance and the importance of you being at work and on time during your scheduled time periods. You were advised on that date of your status under the Attendance Policy, which was a documented Written Counseling. Since that time you have been absent from work on January 23, 2003.  Under the Attendance Policy, you are in the Probationary Warning stage of discipline.

A review of your attendance reveals the following absence or late to work occurrences:

**Occurrences: Absence**

No. 1: April 8 2002
No. 2 May 28 2002
No.3 September 9, 2002
No. 4 October 15 2002 (half day) & Oct 16, 2002
No. 5 January 23 2003

**Occurrences: Tardies**

No.1 January 21 2003 (20 minutes late)

Shirley, you must immediately improve your attendance. I am here to support you anyway I can, but ultimately it is your responsibility to maintain an acceptable level of attendance.  Further absences or tardies within the next rolling 12 months will result in further counseling and disciplinary action, up to and including immediate termination of your employment with Compass Bank.

Please sign below acknowledging receipt of this memorandum:

_____           Date  ___1/27/03___
Shirley Lee

**CC:**   Human Resources

Compass/Lee
019


**Compass Bank**

P.O. Box 2006
Dothan, Alabama 36302
334 712-7030
www.compassweb.com

**TO:**  Shirley Lee

DEFENDANT'S
EXHIBIT
15
PENGAD 800-631-6989

**FROM:**  Jerri Carothers

**DATE:**  July 21, 2003

**SUBJ:**  Attendance – Written Counseling

Shirley, on January 27 2003, we discussed your overall attendance performance and the importance of you being at work and on time during your scheduled time periods. In addition, you were advised on April 8 2003, of your status under the Attendance Policy, which was a documented Verbal Warning. Since that time you have been absent from work on June 9, 2003. Under the Attendance Policy, you are in the Written Counseling stage of discipline.

 A review of your attendance reveals the following absence or late to work occurrences:

<u>**Occurrences: Absence**</u>            <u>**Occurrences: Tardies**</u>

No. 1 September 9 2002
No.2 October 15 2002 (half day) & October 16 2002
No. 3 January 23 2003
No. 4: June 9 2003

Shirley, you must immediately improve your attendance. I am here to support you anyway I can, but ultimately it is your responsibility to maintain an acceptable level of attendance.  Further absences or tardies within the next rolling 12 months will result in further counseling and disciplinary action, up to and including termination of your employment with Compass Bank.

Please sign below acknowledging receipt of this memorandum:

_____            ___7/21/03___
Shirley Lee                          Date

cc:    Human Resources

 **Compass Bank**



Compass Bank
P. O. Box 2006
Dothan, Alabama 36302
334-712-7000

**To:**     Shirley Lee

**From:**   Jerri Carothers

**Date:**   11-19-03

**Re:**     Attendance – Written Counseling

Shirley, as you know acceptable attendance and punctuality are key to our providing quality customer service. On 10/15/03, we discussed your overall attendance performance and the importance of you being at work and on time during your scheduled time periods. You were advised on that date of your status under the Attendance Policy, which was a Verbal Warning. Since that time you have been absent from work on 10-27, and 10-28, 2003. Under the Attendance Policy, you are in the Written Counseling stage of discipline.

A review of your attendance reveals the following absence or late to work occurrences:

<u>Occurrences: Absence</u>

No. 1:  1-23-03
No. 2:  6-9-03
No. 3:  10-14-03
No. 4:  10-27, 10-28

Shirley, you must immediately improve your attendance. I am here to support you anyway I can, but ultimately it is your responsibility to maintain an acceptable level of attendance. Further absences or tardies within the next 12 months will result in further counseling and disciplinary action, including termination of your employment with Compass Bank.

Please sign below acknowledging receipt of this memorandum:

_____          _____
Shirley Lee                                  Date   11/21/03

cc:     Human Resources

Compass/Lee
034

 **Compass Bank**

Compass Bank
P.O. Box 2006
Dothan, Alabama 36302
334-712-7030

To: Shirley Lee



From: Jerri Carothers

Date: February 24, 2004

Re:    Attendance – Written Counseling

Shirley, as you know acceptable attendance and punctuality are key to our providing quality customer service. On 11-19-03, we discussed your overall attendance performance and the importance of you being at work and on time during your scheduled time periods. You were advised on that date of your status under the Attendance Policy, which was a Written Warning. Since that time you have had one occurrence roll off on Jan 23 but have since been absent on February 16 and February 17 2004. Under the Attendance Policy, you are still in the Written Counseling stage of discipline.

A review of your attendance reveals the following absence or late to work occurrences:

<u>Occurrences: Absence</u>

No. 1:  6-9-03
No. 2:  10-14-03
No. 3:  10-27-03, 10-28-03
No.4:   2-16-04, 2-17-04

Shirley, you must immediately improve your attendance. I am here to support you anyway I can, but ultimately it is your responsibility to maintain an acceptable level of attendance. Further absences or tardies within the next 12 months will result in further counseling and disciplinary action, including termination of your employment with Compass Bank.

I have read and understand the above.

_____          _3/2/04_
Employee Signature                        Date

cc:    Human Resources



**DEFENDANT'S EXHIBIT 18**

**Teller:**

**Review Period:**

## Teller Performance Expectations

**#1 Sales Referrals:** The sale of products and services is paramount to the success of the bank with front line recognition of customer needs at its core. Your interaction with customers is to be sufficient enough to produce at least three referrals per day. This level of production is considered proficient. A referral is defined as a customer with a need, an interest and the ability to purchase the product for which they are referred.

**#2 Shorts/Overs:** Your cash drawer is expected to be in balance at all times. Proficient status assigns a period tolerance of up to $1.00 per day X 22 days worked. Proficient status also designates the number of occurrences during this same period at six.

**#3 Other Losses:** You are expected to adhere to deposit acceptance and check cashing policies in accordance with guidelines assigned to you. Responsibilities include but are not limited to a review of deposited items, checking endorsements, signature verification and balance availability. Losses are charged to you only when policies are not followed. Proficient status assigns a period tolerance of up to $1.50 per day X 22 days worked.

**#4 Document Preparation:** Beyond deposit acceptance and check cashing is the area of internal document preparation. You are expected to become proficient in the issuance of Official Checks & Money Orders and accurate in the completion of items such as TT & Ls, CTRs, MILs, bankcard payments, etc. PODs reflect errors in Proof work and are expected to be minimal as are Audit Exceptions. Proficient status permits not more than two occurrences per month.

**#5 Customer Service:** You are the window through which most of our organization is viewed. As such, you are expected to project a positive, competent and pleasant manner that has as its base, courtesy and respect for our customers. Customer interaction is to be non-confrontational, with problematic issues referred to immediate supervisors for resolution. Shopper scores are viewed. as a direct reflection of the quality of work produced and are expected to be at least at the average set by the company in order to be proficient.

**#6 Other:** You will be given specific duties to perform. The way you complete the tasks can have either a positive or negative effect on the banking center as a whole. Assigned duties are expected to be completed accurately and in a timely fashion. Flexibility and cooperation with management are required elements as is arriving on time on days worked. A positive disposition, a sense of urgency and a professional demeanor are essential elements of performing your job in a proficient manner and your display of the Compass Way Principles will be considered as part of your customer service skills and the average of both the shop score and your supervisor evaluation will be calculated

_Shirl Lee_
Teller/Date

_Jori Carothers_ 4-13-04
Customer Service Manager / Date

**Revised 11/01/02**

# Compass Bank

## MINI-PROOF CHECKLIST

DEFENDANT'S
EXHIBIT
19
PENGAD 800-631-6989

☐ "T" notation complete on deposit slip / check

☐ Cash in and cash out validated (on the correct ticket)

☐ Review for Delegated Authority Limits

☐ Verify counter slips
- Full name is complete and legible
- Address is listed and legible
- Account number is legible
- Notations are completed
- Account number is validated on the deposit slip

☐ Fees collected for consignment items and non-customer check cashing

☐ Verify non-customer checks have thumbprints

☐ Identify red flags

☐ All credit card/safe box/cash advances are separated from regular work

☐ Collection items sent to Houston

☐ No cash in work

☐ Credits before debits

☐ Verify proper endorsement and negotiability of items

☐ Transaction is in balance

☐ Recourse account number used

☐ Transactions facing same direction

☐ No staples, rubber bands, or paper clips

☐ Verify completion of CTR/MIL

***Each teller's work should be reviewed once a week at minimum. When reviewing work, account numbers on counter deposit slips should be verified on C-NET on a random basis.***

Compass/Lee
074



# 7 Teller Strategic Questions

**A -**    **Authority?**

**M-**    **Memo Hold?**

**E-**    **Endorsement?**

**R-**    **Recourse?**

**I-**    **Identification?**

**C-**    **Cash Item?**

**N-**    **Negotiable?**

# Check Notations

**Jane Customer**
123 Any Road
Anytown, Anystate 99999

Pay to the
Order of _____

1111

**Bank of Anywhere**

For _____

|: 123456789 |:    0123456789 ||` 1111

| SM / Open Date | ID (Type/#/Date) |
|---|---|
| (Init.) Curr. Bal | IMTL |

Date _____

$_____    Dollars

SC

MP

**Key:**
SC - denotes that you have verified signatures on the Signature Card System
SM - denotes that the system has been checked for messages (stops / pays / holds / comments / monetary activity)
Open Date - Open date of the account as shown on IMI1
ID - denotes that the identification presented has been verified, enter: the type of identification, the id number and the expiration date
(init.) - space for the initials of the individual approving the transaction, based on delegated authorities
Curr. Bal - the current AVAiLABLE balance from the system
IMTL - denotes that you have placed a hold on the system

Compass/Lee
076

# Deposit Notations

DEPOSIT TICKET

**Jane Customer**
123 Any Road
Anytown, Anystate  99999

Date

| SM / Open Date | ID (Type/#/Date) |
|---|---|
| (Init.) Avg Coll | NSF's |

DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL

SIGN HERE IF CASH RECEIVED FROM DEPOSIT

SC

**Bank of Anywhere**

T/C 04

CASH >

SUBTOTAL >

LESS CASH >

NET DEPOSIT >    $

|: 123456789 |:    0123456789 ||`

**Key:**

SC - denotes that you have verified signatures on the Signature Card System.

SM - denotes that the system has been checked for messages (stops / pays / holds / comments / monetary activity)

Open Date - Open date of the account as shown on IM11. (Used to determine need for Reg CC Hold.)

ID - denotes that the identification presented has been verified, enter the type of identification, the id number and the expiration date (Init.) - space for the initials of the individual approving the transaction, based on delegated authorities.

Avg Coll. - the average collected balance from the system (IM1 or IM8.) (Used to determine need for Reg CC Hold.)

NSF's - indicates whether customer is currently overdrawn or has a history of NSF activity. (Used to determine need for Reg CC Hold.)

T/C 04 - indicates a Reg CC Hold has been placed on this deposit.

Compass/Lee
077



Don't "LACK" inspecting
the details on these
types of SCAMS!!

# L-  Less Cash Scam

# A-  Altered Check Scam

# C-  Customer Impersonation

# K-  Kiting



Compass/Lee
078

## The 7 Strategic Teller Questions
### To "Loss Prevention"

Review these seven questions prior to conducting each and every transaction.

### 1. Is this a negotiable item?

- Does the item meet the "5" points of negotiability?
  - Date – not future or stale dated
  - Payee – name and words of negotiability
  - Amount – in numbers and words
  - Drawee Bank – the bank name, address & logo
  - Drawer – the maker's signature

### 2. Is this a cash item?

- Payable upon demand (not future or stale dated)
- Words of negotiability must say, "Pay to the Order Of." (For "Payable At" or "Payable Through" see you CSM – Do not negotiate)
- Must be payable in US funds only
- Must have a valid routing/transit number (TQG, reference tab, page 10)
- Will have no documents attached

### 3. Does the bank have recourse?

- All deposited and cashed items:
  - Is this a Compass Bank customer and an authorized signer (RMLP and RMRB)?
  - Obtain proper identification
  - Check payable to a business must be deposited. They cannot be cashed.
  - On-Us cashed checks
    - Are there enough funds in the account (IMI1)?
    - Are there stops or holds on the check (IMI5)?
  - Transit cashed checks
    - Is this a Compass Bank customer (RMLP or IMI1)?
    - Does the Compass customer have at least half the amount of the check (IMI1)?
    - Is the account in good standing (RMAB/ "alerts," IMI1/ "MSGS", SMIM, IMIO)?
  - Counter items
    - Obtain proper identification
    - If cash back, verify customer signature on Signatrieve and note slip with "SC"
  - Deposit items
    - Review Reg CC job aid

Compass Bank
October, 2003

Compass/Lee
079

**4. Is the item properly endorsed?**

- Was the item endorsed by all payees in front of the teller?
- If it is a counter item and/or over $500, was Signatrieve checked?
- Did you match the endorsement with the customer's identification?
- Obtain CSM approval for all endorsements except Blank and Restrictive (see Endorsement job aid)
- No third party checks are acceptable without CSM approval.

**5. Is identification required?**

- When you don't know the customer
- Cashed checks
- Deposits with cash back
- All counter items
- Obtain thumbprint on all non-customers cashing an on-us check over $100

**6. Do I need to place an IMTL Memo hold or Reg CC hold?**

IMTL
- Place on all on-us cashed checks, for the entire amount
- Place on all transit cashed checks, for $1.00 (TQG, Help Tab, and Pg. 13)
Reg CC Deposit Item Hold Form
  - Completed on all deposits on "new accounts" 30 days old or less.
  - Other hold reasons: see Reg CC job aid for other "Exception" and "Case-by-Case" hold reasons.

**7. Is this within my Check-cashing Limit?**

- My check cashing limit is: $ _____
- My deposit limit is: $ _____
- My cash back limit is: $ _____
- My cash advance limit is: $ _____

Don't forget your "T" on **all** transactions!

For additional information, please refer to your Teller Quick Guide, your CSM or Lead Teller, ROSS and/or the BOM.

7 Strategic Questions, Job Aid

Compass Bank
October, 2003



# When checking ID...always remember to say <u>PLEASE</u>!

**P-** Photo?

**L-** Lamination?

**E-** Expiration?

**A-** Age?

**S-** Signature?

**E-** Erasures?



ELLA JOYCE HAMILTON

63-1511/670
103000/859

1106

DATE 11-18-04

PAY TO THE ORDER OF Cheryl Alkman

$ 1500.00

One thousand five hundred — DOLLARS

FLORIDA GULF BANK

MEMO Loan       7288300 322112204

DEFENDANT'S EXHIBIT 20

Compass Bank
Birmingham, Al
11/22/04

Jennifer Sichler
St Augustine

Talked to Shirly, she really didnt remember anything no explaination about T-bar. Said she didnt think she had to ef it was for our customer

Redacted

Compass/Lee
084



Lt Caroli-

Redacted



DEFENDANT'S
EXHIBIT
21

 **Compass Bank**

P.O. Box 2006
Dothan, Alabama 36302
334-712-7030

**TO:**      Shirley Lee

**FROM:**   Regina McNeil/Jerri Carothers

**DATE:**    January 28, 2005

**SUBJ:**    Performance- Failure to follow Teller Standards/ Delegated
Authority (check cashing limits)

Customers place their trust in our abilities and we must honor that trust by working responsibly and conscientiously. A Compass Bank teller must avoid actions that subject the Bank and its customers to losses.

On September 30, 2004 you cashed a non-Compass check in the amount of $1500.00 for customer Julie M. Brannon. On November 22, 2004 you cashed a non-Compass check in the amount of $1500.00 for Cheryl Alleman. These checks were drawn on accounts in Florida. You failed to obtain customer identification, thumb print, signature was not verified on system and no T bar with required information or customers account number referenced on the check. In addition, you did not receive supervisor's approval and the check was over your delegated authority.

This check was part of several fraudulent checks written against Mrs. Brannon's and Mrs. Alleman's account. Due to the fact policy was not followed when checks were presented for payment, Compass Bank and our office has taken the loss of $3000.00.

In accordance with the Teller Standards you signed on 4/13/04 and delegated authority signed on 11/28/01, the failure to adhere to your checking cashing limit and bank policy and procedures requires us to terminate our employment relationship with you. You may resign if you choose, if not, your employment will be terminated effective immediately.

We wish you the best in your future endeavors. Human Resources will forward to your home address, the benefits termination information. If you have any questions, you may call them at 251-470-7327.

Please sign below acknowledging receipt of this memorandum:

_____      ____1/28/05____
Shirley Lee                                Date

cc:    Human Resources/Personnel File

Compass/Lee
073

Shirley Z. Lee



Tel:
E-mail:

Feb. 01, 2005

Bynum Rogers
Human Resources Director at Southeast Alabama District
Compass Bank
P.O.Box 295
Montgomery, AL 36101

Dear Bynum:

I am writing to you to let you know what happened at the Compass Bank Dothan Main
and I am sincerely hope that things can change before they go any further.

To me, the Compass way should be a kind way, unique, proud way, not the ugly way I
have experienced. On Jan 28, 2005, I was sick from a bad cold; however, considering a
busy day and also Friday, I came to work. Soon after I balanced the drawer and put
works away (It was ten after 6:00 pm), Jerri Carothers (Customer service manager) and
Regina McNeil (Brach Manager at Dothan Main) called me in to sign a letter, which
terminated my employment with Compass Bank because of outage that I had in 2004.

I started to work at Compass Bank April 1 2001, and I have won Compass Bank Gold
Club Award every quarter for the past three years. This is the first time and the only time
that I have caused a loss for Compass Bank, although it was two incidents. Unfortunately
both incidents were brought to me at the same time and on the same day (Dec. 30, 2004).
Then, on Jan. 28, 2005, they showed me the letter and forced me to sign it even though
the content was not honest as it should be. For example, they said that I failed to ask the
customers to do the thumbprint, but, according to the bank regulations, the compass
customers are not required to do so. They have never clearly indicated how much my
check-cash limit was. I have asked Jerri carothers once in early 2004, she said she was
going to look it up for me, but she did not tell me until Jan. 24, 2005. I had always
thought it was $3000.00!

If in fact I did not follow the complete procedure to cash the checks, the managers did not
follow the correct procedures to terminate an employee either ( it was a busy day, so I
forgot to write down the T-bar on the check that I cashed). Prior to that, they did not give
me any kind of warning or probation in writing. Furthermore, Jerri Carothers (customer
service manager) did not handle the matter properly.

On Dec. 30, 2004, she walked to my teller window and told me about the loss and
criticized me in front of every teller with two customers present. I believe it was a very

Redacted

serious matter, which should have been discussed privately or behind the door. Later on, when I told her that, she replied, "Well, we don't have a whole lot of places to go" which is not right, because we have a private conference room here. Also we have break room, copier room and private lady's room. Jerri Carothers treated Jerilyn Harris the similar way in early September last year. Jerilyn was a very good teller, but she had to quit her job with Compass Bank because she was accused wrongly and unfairly. Why? The managers do not like the black people, Asian or other minorities. They treat us differently, without any respect and mercy. In September last year, my life was turned upside down; I had to file a restraining order against my husband. Both managers were aware of that, but none of them had ever showed her concerns to me or offered any help. I knew I needed a couple of days off, but the bank was short-staffed as a result of the extremely high turn over rate, so I did not miss any day at work. I deeply regret that now because it might be one of the reasons for the mistake I made - I couldn't concentrate on my job because of the stress from home and from the working place!

The matter mentioned above is not the only time managers handle things improperly and unprofessionally. Another example was about my vacation day in November last year. I was scheduled to be off on Nov 26, the day after thanksgiving. It was very important because all the daycare was closed that day. I did not have any family members here who could watch my son and it was a difficult day to find a babysitter, because everybody who did not work wanted to go shopping. Jerri Carothers came to me a few days before Thanksgiving and told me that she cancelled my vacation. Because Adrianne quit the job, and we were short-handed. She had to cancel hers on that day too. I told her it was fine, because the job was important. The fact was she took that day off without mentioning any word to me. I did not mind and it was not my business when she took her vacation. My complaint is she lied to me, and did not show any appreciation for my working that day. She never apologized to me for the inconvenience and expense it caused me either.

The last matter, also the most important matter that I want to report is that I feel I have been racially discriminated against and received the personal retaliation from the managers at Compass Bank Dothan Main. I wanted the position of FSR before I started the teller position. Brenda, who was former Human Resources Director, told me that they did not have any opening then. So I took the teller job anyway because lots of my friends have accounts with Compass Bank. From year 2002 to year 2004, the same FSR position has been opened four times. I applied the first time, it was turned down, second time was turned down, and the third time was turned down. Regina McNeil told me that she had had a trained person transferred to the position. She would put me into consideration when the position opened again. It did, when Holly Brownnell quit her job. However, she never mentioned it to me and intentionally ignored it, because she does not like me, because I am a Chinese-American and also because I do not agree with her on some issues. Compared to the person she hired, I have more qualifications. I have more than seven years banking experience; I have a bachelor's degree in international business and a Master's degree in business administration earned from Troy State University in Troy (the new FSR does not have any college degree). I am hard working, self-motivated and